IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:15-CT-3049-FL

| | |
|---|---|
| RONNIE WOODS, | ) |
|       Plaintiff, | ) |
| v. | )     ORDER |
| THE UNITED STATES OF AMERICA, | ) |
|       Defendant. | ) |

The matter comes before the court on defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(a) (DE 20). The issues raised have been fully briefed and are ripe for adjudication. For the following reasons, the court grants defendant's motion.

### STATEMENT OF THE CASE

On February 20, 2015, plaintiff, a federal inmate, filed this action *pro se* pursuant to the Federal Torts Claim Act ("FTCA"), 28 U.S.C. § 2672, *et seq.*,[1] alleging that Butner medical staff failed to timely remove his post-operative surgical staples, causing him to suffer pain in his left foot which eventually required surgical intervention. Plaintiff subsequently filed a motion to be excused from complying with North Carolina Rule of Civil Procedure 9(j)'s requirement that a qualifying medical professional certify that the medical care provided to the plaintiff fell below the applicable

---

[1] Plaintiff also asserts a claim pursuant to 42 U.S.C. § 1981 in his complaint. In order to state a claim pursuant to § 1981, however, a plaintiff must allege a racially discriminatory purpose. See Runyon v. McCrary, 427 U.S. 160, 168 (1976); see, e.g., Spriggs v. Diamond Auto Glass, 165 F.3d 1015, 1018 (4th Cir. 1999). Here, plaintiff alleged negligence and not race discrimination. Thus, plaintiff's § 1981 claim is DISMISSED without prejudice.

standard of care. Plaintiff next moved to amend his complaint to supplement his allegations. On July 21, 2015, the court granted plaintiff's motion to amend, but denied plaintiff's motion to be excused from complying with Rule 9(j). The court, however, determined that plaintiff alleged sufficient facts to proceed with his negligence claim pursuant to the doctrine of *res ipsa loquitur*.

On November 2, 2015, defendant filed a motion for summary judgment arguing that plaintiff is unable to establish that the doctrine of *res ipsa loquitur* applies in this action. Defendant attached to its motion excerpts from plaintiff's medical records as well as the following personal declarations: Dr. Tawfiq Ansari ("Ansari"), a medical officer at the Federal Medical Center in Butner, North Carolina ("Butner"); Chauna Brooks, a commissioned officer in the United States Public Health Service ("PHS") assigned to work at Butner as a Physician Assistant; Dr. Emmeline Edouard ("Edouard"), a mid-level practitioner at Butner; and Douglas Henry, a PHS officer assigned to work at Butner as a clinical specialist for wound care.[2] The motion was fully briefed. On December 28, 2015, plaintiff filed a motion to appoint counsel, which the court denied.

## STATEMENT OF FACTS

The facts viewed in the light most favorable to plaintiff may be summarized as follows. On April 25, 2014, plaintiff had emergency surgery at the University of Wisconsin Hospital to remove blood clots in his groin and lower left leg. (Ansari Decl. ¶ 8 and Attach. 1, pp. 11-25). At the same time, plaintiff underwent a four-compartment fasciotomy of his lower left leg– a limb-saving surgical procedure whereby the skin of the leg is cut to relieve tension or pressure causing a loss of circulation. (Id.) In performing the procedure, the operating physicians opened the anterior and

---

[2] The November 2, 2015, declarations of Brooks and Edouard were not signed. On November 9, 2015, defendant filed a notice indicating that it was re-filing copies of Brooks and Edouards' respective declarations which contained original signatures.

lateral compartments of plaintiff's leg completely, which allowed the muscles of plaintiff's lower left leg to bulge out of the skin. (Id. p. 12). The physicians then opened the superficial posterior compartment and the deep compartment of plaintiff's leg to expose the muscles. (Id.)

On April 28, 2014, plaintiff underwent a second multi-procedure leg surgery to address his blood clots and poor blood flow. (Id. ¶ 9 and Attach. 1, pp. 19-20). As part of the second procedure, plaintiff received an approximately 28 inch square skin graft to close the fasciotomy incision. (Id. pp. 20-21). The surgical physicians used staples and nylon sutures to attach the skin graft to the tissue on his lower left leg, but did not indicate in plaintiff's medical records how many staples were used during the procedure. (Id. p. 95; Edouard Decl. ¶ 7; Brooks Decl. ¶ 4). In plaintiff's discharge recommendations, the University of Wisconsin Hospital medical staff stated that plaintiff's sutures and staples would be removed at plaintiff's June 6, 2014, follow-up appointment. (Ansari Decl. ¶ 9 and Attach. 1, p. 42).

On May 12, 2014, plaintiff returned to the University of Wisconsin Hospital, and was diagnosed with methicillin sensitive staph aureus ("MSSA") and pseudomonas infections at the location of his skin graft on his inner leg. (Id. ¶ 110; pp. 61, 72-73). Plaintiff also was diagnosed with MSSA and Acinetobacter baumannii infections in an incision on his upper left leg. (Id. ¶ 10 n.4 and Attach. 1, pp. 95-97). The University of Wisconsin Hospital Medical staff treated plaintiff's infections with a 14-day course of intravenous antibiotics. (Id. pp. 61, 95). Plaintiff was transferred from the University of Wisconsin Hospital to Divine Savior Healthcare for daily wound care and rehabilitation. (Id. ¶ 11 and Attach. 1, pp. 79-81).

On May 28, 2014, plaintiff was discharged from Divine Savior Healthcare, and his discharge papers noted the following:

3

> [Plaintiff] was seen by our wound care nurse and underwent daily dressing changes of his lower extremity fasciotomy wound. These extensive elliptically shaped wound with skin graft oriented vertically over most of his lateral left lower leg appeared quite healthy and improved over the course of his stay here. Small staples were present intermittently around the parameter of this wound, as well as nylon sutures over medial left lower leg incision that appeared uncomplicated. Several staples were noted at the catheter insertion site which had developed a stable subcutaneous hematoma in the left groin. All of these staples were intended to be removed at the follow up plastic surgery visit on June 11'th, and our wound nurse consulted with the surgical facility to verify this and they were therefore not removed here.

(Id. p. 95).

On May 28, 2014, plaintiff was transferred to Butner and admitted to the 5B Unit, which is an in-patient hospital unit reserved for inmates who require closely monitored medical care. (Id. ¶ 13 and Attach. 1, pp. 95, 98). Butner medical staff then examined plaintiff on June 7, 2014. (Id. ¶ 15 and Attach. 1, p. 100). Plaintiff expressed no complaints to medical staff during his examination, but asked when his staples could be removed. (Id. pp. 101-102). Medical staff notified plaintiff that "per MD note, staples are expected to be removed on June 11th, but this date is not definite/pt acknowledged." (Id. p. 102). At a second appointment on June 12, 2014, plaintiff "stated [to Butner medical staff] that this staples were initially supposed to be removed on 6/6/14" and expressed concern "that the staples may cause his leg to become infected." (Id. ¶ 16 and Attach. 1, p. 106). Plaintiff did not show any signs of an infection in his leg at that time. (Id. pp. 104-107).

On June 13, 2014, plaintiff attended an appointment with Butner medical staff and insisted that his staples be removed. (Id. ¶ 17 and Attach. 1, pp. 108-113). Later that day, Edouard examined plaintiff and noted that plaintiff "[a]ppear[ed] [w]ell" and his wound was "[i]mproving." (Edouard Decl. ¶ 7 and Attach. 1, p. 2). During the examination, plaintiff complained of aching pain

4

in his lower left leg, and again requested that his staples be removed. (Id. p. 1). Edouard then removed all of plaintiff's visible staples "with minimum bleeding." (Id. ¶¶ 6-7 and Attach. 1, p. 3). During the procedure, Edouard did not observe that any staples had migrated below the surface of plaintiff's skin graft. (Id. ¶ 7). Edouard and Ansari each state in their respective declarations that even if there was any indication that any staples had migrated below the surface of plaintiff's skin, Edouard properly decided not to re-open plaintiff's skin graft because it would have exposed plaintiff's wound to additional trauma and renewed risk of infection. (Id. Edouard Decl.¶¶ 7-8, 12; Ansari Decl. ¶ 31). Plaintiff was discharged from Butner's 5B unit on June 23, 2014. (Ansari Decl. ¶ 18 and Attach. p. 112).

On June 24, 2014, Dr. Chad Caldwell, an outside general surgeon, examined plaintiff. (Id. ¶ 19 and Attach. 1, pp. 151-152). In the course of the examination, Dr. Caldwell removed a few areas of dead tissue around the edge of plaintiff's skin graft, but otherwise noted that plaintiff "has been doing well" and that "the graft is almost 100% take." (Id. p. 151). Then, on July 2, 2014, plaintiff was seen by Brooks, a physician assistant, and complained of foot pain which he attributed to a potential staple in his wound. (Id. ¶ 20 and Brooks Decl. ¶ 4 and Attach. 1). In the course of examining plaintiff's graft area, Brooks felt something below plaintiff's skin. (Brooks Decl. ¶ 4). Accordingly, Brooks requested electromagnetic radiation ("x-ray") testing of plaintiff's graft area, and the x-ray results revealed additional staples under plaintiff's skin graft. (Id.)

Later on July 2, 2014, Brooks referred plaintiff to Henry, a certified wound specialist, and Henry examined plaintiff that same day. (Brooks Decl. ¶ 4 and Henry Decl. ¶ 10 and Attach. 1, p. 3). In the course of his examination of plaintiff, Henry observed that plaintiff's skin graft was healing well with no signs of infection. (Id. pp. 4, 7-8). Henry discussed with plaintiff a

5

recommended treatment plan, which focused on "promot[ing] healing of [plaintiff's lower left leg] ulceration in 4-6 weeks." (Id. pp. 7-8). Henry explained to plaintiff that reopening plaintiff's skin graft to remove any residual staples would entail risks for plaintiff's continued healing. (Id. ¶ 10).

Henry next evaluated plaintiff on July 14, 2014. (Id. ¶ 11 and Attach. 1, pp. 10-12). During the examination, plaintiff denied any pain in his lower left leg and did not have any inflamation in the area. (Id.) Plaintiff, however, expressed concern over the residual staples under his skin graft. (Id. p. 10). In response, Henry "discussed [with plaintiff] the variety of procedures" that had been performed on plaintiff's lower left leg, as well as the "improvement in the current wound bed." (Id.) The following day, plaintiff saw Dr. Caldwell for a scheduled appointment. (Ansari Decl.¶ 22 and Attach. 1, pp. 153-54). Plaintiff complained to Dr. Caldwell of "ongoing pain and numbness and tingling in his left foot." (Id.) Dr. Caldwell noted the following:

> There are still a couple spots on the left lateral aspect that have not completely closed. There is also one staple that was noted in the middle of the graft that was removed. The patient overall is doing quite well. Would continue the Xeroform and gauze until the wound is completely healed, would guess this would take place in the very near future. I would consider Neurontin and/or Lyrica for his neuropathy.

(Id. p. 154). On July 23, 2015, Henry again examined plaintiff and noted plaintiff's complaints of feeling "pins & needles" in his lower left leg and concerns about the staples below his skin graft. (Henry Decl. ¶ 12 and Attach. 1, p. 13).

On August 25, 2015, Henry examined plaintiff during which time plaintiff continued to express concern about the staples and voiced complaints of "pins and needles type pain," which Henry described as "neuropathic." (Id. ¶ 17 and Attach. 1, p. 21). By September 3, 2014, plaintiff's wound had healed entirely. (Id. ¶ 18 and Attach. 4). The next day, Henry saw plaintiff, and plaintiff

6

complained of pain and tenderness at the graft site. (Id. ¶ 19 and Attach. 1, p. 24). Henry attributed plaintiff's pain to normal post-surgery swelling in plaintiff's lower left leg. (Id.)

On October 7, 2014, plaintiff attended a follow-up appointment with Dr. Caldwell. (Ansari Decl. ¶ 23 and Attach. 1, pp. 155-156). In the course of the examination, plaintiff complained of pain in his left ankle, difficulty walking, and was "convinced his pain [was] coming from retained staples." (Id. p. 155). Dr. Caldwell, however, determined that it was "unlikely" that any residual staples were causing plaintiff's pain. (Id.) Dr. Caldwell further "had a long discussion with [plaintiff] and advised [plaintiff that his pain was] most likely emanating from a neuropathy secondary to the original problem and extensive surgery that he had many months ago." (Id.) Dr. Caldwell's clinical notes further stated in pertinent part:

> It is unlikely they are caused from any residual staples and it was my advice to keep those if there are any present. However, the patient is very convinced the pain is from the staples. Therefore, we will obtain the plain films of the leg. If there are residual staples, I can remove these; however, the risk of that creating new wounds is very real. The patient appears to understand that and does want to proceed with excision of them if there are any present. Therefore, would obtain plain films of his left leg and refer him back to me if there are staples present.

(Id.)

On October 14, 2014, plaintiff had an x-ray study of his left leg. (Id. Attach. 1, p. 120). Plaintiff's x-ray results reflected a total of nine surgical staples in the left anterolateral aspect of plaintiff's calf. (Id.) The x-ray report further stated that "there is no evidence of bone destruction. There is some periosteal reaction along the proximal fibular diaphysis which may be related to old trauma." (Id.)

7

On November 4, 2014, plaintiff attended a follow-up appointment with Dr. Caldwell. (Id. pp. 157-158). After examining plaintiff, Dr. Caldwell recorded the following comments:

> I had a long discussion with [plaintiff]. I did tell him that I believe his pain is most likely from underlying neuropathy and/or nerve damage related to his previous infection and surgery. However, it is possible he is having some pain from the staples that are left behind and he could possibly get relief from their excision. He wants to proceed with this. I did inform him the risk would be that he will continue to have pain despite their removal. I also informed him that we will remove the staples in the areas where he is hurting only to minimize trauma to this area which was very difficult to heal previously. Also discussed with him that that is the great risk, that removing the staples it will reopen the wound and can create further wound healing issues for him. He is clearly aware of this and again wants to proceed. Therefore, we can schedule was under MAC anesthesia and fluoroscopy to identify the clips that are left behind.

(Id.)

On January 13, 2015, plaintiff attended a pre-operation evaluation with a Butner medical provider. (Id. p. 123). Because plaintiff still was taking anti-coagulation medication at that time, he was not cleared for surgery. (Id.) Then, on January 23, 2015, plaintiff attended an appointment with Butner medical staff in response to plaintiff's complaints of persistent pain in his lower left leg. (Id. p. 125). After examining plaintiff, the medical provider noted that plaintiff had no response in his left superficial peroneal nerve and a decreased response in other nerves. (Id.) The provider determined that the findings were consistent with damage to a nerve in plaintiff's lower left leg, resulting in both sensory loss and a loss of reflexes in that area. (Id.) Plaintiff subsequently attended a consultation with an outside neurologist, who attributed plaintiff's "primarily sensory" neuropathy to his prior inadequate blood flow to his lower left leg, and to his prior fasciotomy. (Id. ¶ 28 and Attach. 1, pp. 132-133).

Plaintiff's staple-removal surgery subsequently was rescheduled for February 25, 2015, but was cancelled because the anesthesiologist was not available. (Id. ¶ 29 and Attach. 1, p. 130). On March 25, 2015, the residual staples were removed from plaintiff's leg. (Id. pp. 135-136, 138-139). After the completion of his surgery, plaintiff reported the following during his post-operative evaluation: "I don't know what they did to my leg in surgery but it's killing me. My foot is not hurting anymore it must have been the staples." (Id. p. 138). On April 7, 2015, a Butner medical provider noted that plaintiff "continues to complain of pain in left lower leg where foreign bodies (7 staples) were removed on 3/25/15." (Id. p. 142). Medical staff provided plaintiff with pain medication and instructed him to follow-up through the sick call process if the pain continued. (Id.)

**DISCUSSION**

A.  Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 250.

9

B. Analysis

Plaintiff alleges that Butner medical staff negligently failed to timely remove surgical staples causing plaintiff pain in his left foot which resulted in surgical intervention. North Carolina imposes substantive legal requirements that a person must follow to pursue a medical malpractice claim. See N.C. R. Civ. P. 9(j). Under North Carolina Rule of Civil Procedure 9(j), a plaintiff's medical malpractice complaint must assert that the medical care has been reviewed by a person who is reasonably expected to qualify (or whom the plaintiff will move to qualify) as an expert witness and who is willing to testify that the medical care received by the plaintiff did not comply with the applicable standard of care. See N.C. R. Civ. P. 9(j)(1), (2); see, e.g., Frazier v. Angel Med. Ctr., 308 F. Supp. 2d 671, 676 (W.D.N.C. 2004); Moore v. Pitt County Mem'l Hosp., 139 F. Supp. 2d 712, 713 (E.D.N.C. 2001) ("Plaintiff's complaint alleges medical malpractice claims against PCMH, and she is required to comply with certification requirement of Rule 9(j), which she failed to do."). Failure to comply with Rule 9(j) is grounds for dismissal of a state medical malpractice claim brought in federal court. See Littlepaige v. United States, 528 F. App'x 289, 293 (4th Cir. 2013); see, e.g., Estate of Williams-Moore v. Alliance One Receivables Mgmt., Inc., 335 F. Supp. 2d 636, 649 (M.D.N.C. 2004). Alternatively, the complaint must allege facts establishing negligence under the common-law doctrine of *res ipsa loquitur*. See N.C. R. Civ. P. 9(j)(3).

In this case, plaintiff admits that no certification has been submitted, but instead relies upon the doctrine of *res ipsa loquitur*. "[T]here is a strong presumption under North Carolina law that, in the medical malpractice context, *res ipsa loquitur* will not apply." Littlepaige, 528 F. App'x at 295. In order for the doctrine to apply, "the negligence complained of must be of the nature that a jury–through common knowledge and experience–could infer." Diehl v. Koffer, 140 N.C. App. 375,

379 (2000); see, e.g., Tice v. Hall, 310 N.C. 589, 593 (1984) (surgical sponge left in patient's body). Specifically, the "doctrine of res ipsa loquitur applies when (1) direct proof of the cause of an injury is not available, (2) the instrumentality involved in the accident was under the defendant's control, and (3) the injury is of a type that does not ordinarily occur in the absence of some negligent act or omission." Robinson v. Duke Univ. Health Sys., Inc., 229 N.C. App. 215, 224 (2013) (quotations omitted). Additionally, "in order for the doctrine to apply, not only must plaintiff have shown that [the] injury resulted from defendant's [negligent act], but plaintiff must be able to show-without the assistance of expert testimony-that the injury was not of a type typically occurring in absence of some negligence by defendant." Howie v. Walsh, 168 N.C. App. 694, 698 (2005) (quotations omitted); Diehl, 140 N.C. App. at 378 ("[A]pplicability of the res ipsa doctrine depends on whether as a matter of common experience it can be said the accident could have happened without dereliction of duty on the part of the person charged with culpability.") (emphasis in original, quotations omitted).

Upon a review of the record, the facts of this case are not such that a layperson could infer negligence on the part of Butner medical staff based on common knowledge. The relevant questions in this case are whether the two day delay[3] in removing plaintiff's staples and subsequent medical decisions with respect to the removal of the residual staples constituted negligence. These questions

---

[3] The court notes that plaintiff's treating physicians in Wisconsin moved the date for plaintiff's staple removal procedure from June 6, 2014, to June 11, 2014. (Ansari Decl. ¶ 13 and Attach. 1, p. 95) (reflecting that the decision to change the date for plaintiff's staple removal procedure was made by plaintiff's treating physicians at the University of Wisconsin Hospital prior to plaintiff's transfer to Butner). Plaintiff does not allege, and there is no evidence to support a finding, that Butner medical staff, or any other federal actor, was involved with such decision. Thus, plaintiff cannot pursue a claim under the FTCA with respect to the decision to delay plaintiff's staple removal procedure from June 6, 2014, to June 11, 2014. See 28 U.S.C. § 2674; see also, Sheridan v. Reidell, 465 F. Supp. 2d 528, 531 (D.S.C. 2006) (finding that a claim under the FTCA lies only against the United States).

11

may not be answered in the absence of expert testimony, particularly where it is undisputed that plaintiff's condition was serious and required intensive post-operative care following his extensive leg surgeries and infections. (Ansari Decl. ¶¶ 10, n. 4 and Attach. 1, pp. 61, 72-73, 79-81, 95). Under such circumstances, the decisions regarding how and when to treat a plaintiff's medical condition is a professional service requiring the use of specialized skill and knowledge requiring certification pursuant to Rule 9(j). See Alston v. Granville Health System, 221 N.C. App. 416, 421 (2012) ("The evidence presented by Defendants in support of their summary judgment motions, however, shows that the decision to restrain a patient under anesthesia is one that requires use of specialized skill and knowledge and, therefore, is considered a professional service."); see, e.g, Deal v. Frye Regional Medical Center, Inc., No. COA09-873, 2010 WL 522727, at *2 (Feb. 16, 2010) ("When nurses make 'medical decisions requiring clinical judgment and intellectual skill,' they are providing professional services, and therefore the action against them must be certified per Rule 9(j)") (quoting Sturgill v. Ashe Mem'l Hosp., Inc., 186 N.C. App. 624, 630 (2007)).

The instant action is distinguishable form the typical *res ipsa loquitur* case where a surgeon unwittingly and inadvertently leaves a sponge or other foreign object inside a patient's body, because Butner medical staff did not act unwittingly or inadvertently. To the contrary, Butner medical staff made decisions with respect to plaintiff's surgical staples after fully evaluating plaintiff's condition and medical history. After assessing plaintiff's condition, Butner medical staff held the opinion that it was not necessary to remove the residual staples at any point given the difficulties plaintiff previously experienced with healing, and that the graft was moving steadily toward 100 percent closure without complications or signs of new infection. (Edouard Decl. ¶¶ 7-8, 12; Ansari Decl. ¶ 31; Henry Decl. ¶ 28). Butner medical staff's opinion with respect to the residual

12

staples was corroborated by Dr. Caldwell, an outside treating physician. (Ansari Decl. Attach. 1, pp. 151-57). Further, there is evidence in the record that plaintiff's continued leg pain resulted from nerve damage rather than the failure to remove the residual staples. See (Ansari Decl. Attach. 1, pp. 154, 155-156).

Establishing negligence under these circumstances is not a simple *res ipsa loquitur* inference, nor would the standard of care fall within the common knowledge or understanding of judges or lay jurors. See Williams v. Dameron, 37 N.C. App. 491, 498-99 (1978) (finding *res ipsa loquitur* inapplicable where surgeon intentionally refrained from removing a portion of a lost scalpel tip which had broken off during back surgery because he wanted to minimize blood loss and did not feel it would harm the patient); see also Dumont v. United States, 80 F. Supp. 2d 576, 581 (D.S.C. 2000) (finding *res ipsa loquitur* inapplicable where surgeon failed to have proper equipment to remove surgical staples or leaving broken staple in place where "the proof presented [] leaves it equally probable that the source of the plaintiff's continued pain may have been due to a cause other than the partial staple or some other cause for which the defendant was or was not responsible.").

Finally, the doctrine of *res ipsa loquitur* is inapplicable to plaintiff's negligence claim because plaintiff's pleadings allege the direct and specific cause of his injury–the alleged delay in removing the residual staples. See Rowell v. Bowling, 197 N.C. App. 691, 697 (2009) (finding *res ipsa loquitur* inapplicable where plaintiff "offered direct proof of the cause of the skin incisions made to her left knee and complained that such incisions caused her pain and damages").

In sum, plaintiff has not properly pleaded facts meriting application of the doctrine of *res ipsa loquitur,* and thus the exception to Rule 9(j) does not apply. Because plaintiff fails to meet the requirements of Rule 9(j), his negligence claim is DISMISSED without prejudice.

13

## CONCLUSION

Based upon the foregoing, defendant's motion for summary judgment (DE 20) is GRANTED, and plaintiff's FTCA action is DISMISSED without prejudice. Plaintiff's action pursuant to § 1981 also is DISMISSED without prejudice. The clerk of court is DIRECTED to close this case.

SO ORDERED, this the 24th day of August, 2016.

_____
LOUISE W. FLANAGAN
United States District Judge